K6PAATUNC–CORRECTED          Conference

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

JENNIFER TUNG, INDIVIDUALLY
AND ON BEHALF OF ALL OTHERS
SIMILARLY SITUATED,

                    Plaintiff,

            v.                          18 CV 1611 (MKV)

BRISTOL–MYERS SQUIBB COMPANY,
ET AL.,

                    Defendants.

------------------------------x
                                        New York, N.Y.
                                        JUNE 25, 2020
                                        2:00 p.m.

Before:

                    HON. MARY KAY VYSKOCIL,

                                        District Judge

                         APPEARANCES

BERNSTEIN LITOWITZ BERGER & GROSSMANN, LLP
        Attorneys for Lead Plaintiff Arkansas
BY:  LAUREN A. ORMSBEE

KIRKLAND & ELLIS, LLP (NYC)
        Attorneys for Defendant Bristol–Myers Squibb
BY:  YOSEF J. RIEMER

K6PAATUNC-CORRECTED        Conference

(Remote Telephonic Conference)

THE COURT:  Good afternoon.  This is Judge Vyskocil.

Ms. Dempsey, would you call the calendar please.

COURTROOM DEPUTY:  Yes, your Honor.

We are hear in the matter of 18 CV 1611, Tung v. Bristol Myers Squibb Company.

Counsel, starting with plaintiffs, please state your name for the record.

MS. ORMSBEE:  Good afternoon, your Honor.

my name is Lauren Ormsbee, from the law firm of Bernstein Litowitz Berger & Grossmann, here for lead plaintiffs APERS and Louisiana Sheriffs.  Here with me today from my firm is Salvatore Graziano and Jesse Jensen.

THE COURT:  All right.  Good afternoon, all.

And you thank you Ms. Ormsbee.

MR. RIEMER:  Thank you, your Honor.

For the defendants, this is Yosef Riemer with Kirkland & Ellis.  It is more difficult because I am not physically with my colleagues but I believe on the line are my partner Matthew Solum, my colleagues Jace Cearley and Dan Cellucci, as well as a number of people from Bristol Myers, including Don McGower and I believe the general counsel of the company, Sandra Leung. I am sure there are many others on the line but I beg the Court's indulgence.  I am not able to tell you each and every person that dialed in.

THE COURT:  All right.  Is there anybody else who wishes to enter an appearance?

OK.  So hearing no one, we do have a court reporter on to the line, Ms. Moore; is that correct?

COURT REPORTER:  Yes, your Honor, I am here.

THE COURT:  Thank you very much.

So, before we get started, just to remind people, obviously, we are still operating under restrictions as a result of the COVID pandemic.  I just would start by saying that I hope that everyone who is performing is healthy and safe.

For the record, in light of the public health precautions we are having oral argument today telephonically.  The line is open to the public and to the press just like our courthouses would be if we were all assembled together in person.

I want to remind people that there are strict prohibitions against recording or rebroadcasting court proceedings.  Please bear that in mind.

Also, I just introduced you all to Ms. Moore who is our court reporter.  She will be transcribing our arguments today.  I would ask everybody just so that we can have an orderly proceeding, if you are not speaking or addressing the court that you please mute your line so that we don't get background noise or any interference.

K6PAATUNC-CORRECTED        Conference

I'd also ask that each time you speak before you address the Court, please identify yourselves so that Ms. Moore can attribute the statements that are made to the correct person and that we can have a clear record.  I'd ask people as well to please not interrupt one another.  I assure you that I will give everyone who wishes to be heard in connection with the motion that is before me, an opportunity to speak but we need to do this in an orderly fashion.

I also want to remind people that at the conclusion of the hearing if you wish to order a copy of the transcript, you need to make a request.  There is a transcript request form on the Court's website that you can use or you can be in touch with Ms. Moore to get a copy.

Final thing I wanted to say, if you inadvertently or for reasons of technology get dropped from the call, please, just dial back using the same number and code that you originally used and you will be joined back into the call.  All right?

With that, we are here in the matter of the security class action that was brought against Bristol Myers and before me is a motion to dismiss that has been brought by the defendants.  So, I will hear from the defendants first on your motion and I assume -- who is speaking for the defendants?

MR. RIEMER:  Your Honor, it is Yosef Riemer, R-I-E-M-E-R, of Kirkland & Ellis.

K6PAATUNC-CORRECTED        Conference

THE COURT:  All right.  Mr. Riemer, you have the floor.

I'm sorry to interrupt.  I should have said one other thing.  By way of background, please, bear in mind that I have carefully read and studied all of the submissions that have been made to the Court and familiarized myself with Judge Oetken's opinion as well.  So, I'd ask you to bear that mind in terms of the argument you are making to me today.

All right.  Mr. Riemer, I'm sorry.

MR. RIEMER:  Thank you very much, your Honor.  And thank you for hearing us under these challenging conditions.

The first thing I want to say relates to a request we received by your law clerk.  The Court understandably expressed interest in a redline.

THE COURT:  Yes, I received it.

MR. RIEMER:  And I sent in what the plaintiffs had filed, a redline they prepared.  And in the course of this, I've come to learn and I certainly don't accuse anybody of anything, but I just want to highlight for the Court, redlining turns out is perhaps less a precise science than one thinks.  There is a great deal of text that shows up in blue as if it's new that in fact is not.  And I am told that the way redlining works, if one drags or cuts and pastes it will show up as just moved but if one cuts and deletes and then pastes or something else, then it shows up as new and that happens frequently.  And

K6PAATUNC-CORRECTED          Conference

just to give you one example, if the Court wanted to look at the redline, page 65 of 143 at the top of the page in the numbering that the Court gives --

THE COURT:  Right.  Give me one moment to open the document.  Mine is a little bit slow.

MR. RIEMER:  The top of the page if that numbering is better it says 65 of 143.

THE COURT:  I am just going to type in the "65" in the adobe and see what they get.  I'm with you.

MR. RIEMER:  At the bottom do you see a lengthy footnote in blue, your Honor?

THE COURT:  Yes.

MR. RIEMER:  Now, that looks like it's all new text. So, now if I could ask your Honor to go to page 102 of 143.

THE COURT:  Yes.

MR. RIEMER:  At the bottom page there's a footnote that's all crossed out.  That's same text.  And again, I'm not accusing anybody of in any way when they did this redline long, long ago of misleading anybody.  But apparently, these are the limits of the redlining itself and I just didn't want the Court to think that any time text is in blue it is new.  In some cases it is word-for-word the same as this.  And other times something shows up as a change but it's essentially a stylist change.  I will address what I view as five buckets of changes that they've made and whether they change anything in terms of

the result but I did just want to highlight that because I don't want the Court to be misled.

I realize the Court has read the papers and I appreciate that, but I do just want to as a preliminary matter highlight one key fact or one key point about the legal context that separates that respectfully, I suspect many if not all other kinds of motions to dismiss were governed here by the Private Securities Litigations Reform Act which the Supreme Court said in Tellabs was enacted as a check against abusive litigation by private parties.  The statute is unique as the Tellabs Supreme Court opinion pointed out in requiring that plaintiffs not only state the facts with particularly but more important importantly, that they state with particularly, they state facts evidencing scienter.  And to quote the statutory language, and to state with particularity facts giving rise to a strong inference the defendant acted with the required state of mind.  And the Tellabs opinion to the Supreme Court essentially adopting the Second Circuit standard that had become part of the statute makes a comparative, a qualitative assessment by saying it must be more than merely reasonable or permissible.  It must be compelling.

So, inherent in this is that one just doesn't get to check boxes for plaintiff and say I have a former employee or I am alleging something as an industry understanding or I've cited a piece of literature.  The Court gets to look at the

piece of literature and see if it supports that. It gets to look at what the former employee has said and see if it really goes as far as the plaintiffs say and whether it's sufficient to create a strong inference of scienter. And that's a critical point here.

THE COURT: Counsel, let me just ask you, you do concede though that given that this is a motion addressed to the pleadings, the Rule 12(b)(6) motion, I am compelled to accept the allegations by the plaintiff, factual allegations, as true and to draw reasonable inferences in favor of the plaintiffs?

MR. RIEMER: I do, with these caveats. It has long been the law -- we used to have this all the time where plaintiffs would file securities cases and say all of the analysts bought "X", cherrypicking which analyst they cite. And we know they are allowed to say and the Court's allowed to take judicial notice and say the opposite. Likewise, if they say all the analysts' reports say "X" and the very ones they have cited contain quotes saying the opposite, the Court is allowed to see that.

So, as to properly factual allegations, that is true. But the Court doesn't have to accept conclusory allegations. It is doesn't have to accept characterizations of documents incorporated in the pleading or which the Court can take notice which contradict what's there. And fundamentally, the notion

of whether there's a strong inference of scienter is one where you say I assume what they say about a trade is true but is insufficient from which to infer the facts make it suspicious and completely out of line with what had happened in the past such that they met this very unusual statutory directive to engage in a qualitative assessment.  It's not that you have carte blanche if they make a particular factual allegation with the specificity required to ignore it but I do think those caveats are important, your Honor, and I think that really did guide the decision here.  As I said, the key point is that there's a qualitative assessment made as to whether they've created a strong inference.  I don't think you have to accept the allegations in the first instance if they're contradicted by the documents or conclusory.  As I'll talk about, I don't think you have to accept any allegations that come from an expert because they have to plead facts -- not saying the other expert agrees with them -- but fundamentally, once you get through, once we have a corpus of facts that have passed through that, then I think you're asked to ask another question which is ultimately to compare what the plaintiffs have, if you will, put on the Court's table from which one is supposed to be able to judge what inference is possible due to other permissible inferences.  And again, unlike other areas of the law I know, it is only under the cases if the inference of a wrongful intent is as strong, so you really are comparing what

inferences fall from the allegations.

Because Judge Oetken dismissed here for the plaintiff's failure to meet the pleading standard on scienter, I don't want to address that and the changes in the complaint with regard to that most correctly.  If the Court has questions, I could talk about the other two grounds we've moved on which were they hadn't pled any false or misleading statements and they failed to meet the requirement on loss causation.

Your Honor, as I was preparing for this I was really struck -- and I'll get in a minute to what's changed and what hasn't -- but I was really struck by what this comes down to in their own words.  I was struck by language in paragraph 10 of the second amended complaint.  And that appears on page 12 of 143.  This is really a critical allegation and I just want to talk about it for a second.  It says:

If successful defendant's secret gamble -- they're talking how we were structuring our trial in describing it -- would have resulted in a superior label for Opdivo over Merck's Keytruda which was undergoing a contemporaneous trial Keynote-024-aimed at strong PD-LI express, meaning at least the 50 percent level.  In the new and rapidly evolving industry of PD-1 checkpoint inhibitors, the explicit definition of strong PD-L1 expression by one of the industry's dominant players settled the industry consensus that "strong" referred to

K6PAATUNC-CORRECTED        Conference

50 percent or greater PD-L1 expression.

In other words, if the plaintiff's premise on the idea that when Merck stated it was defining "strong" for purposes of its own study, that became something that no one else could understand differently.

And, your Honor, that's extraordinary.  We're not talking about somebody making a statement about gravity, that people have known about since the apple fell on Newton's head. We're talking about what the very paragraph concedes was a field that was undergoing rapid change in which as they agree in their papers, continues to undergo rapid change.

Note, the only trial completed, there is no allegation in this complaint, none, that there was prior to the beginning of this class period, any trial by anyone involving a PD-L1 inhibitor where the manufacturer had ascribed a cutoff as involving "strong" expression or "strongly" or "high" or anything like that involving the disease we're talking about, non small cell lung cancer, which had met its primary endpoint, in other words, been a success of, trial got an approval and so on.  None.  OK?

So, the assertion is that even though no trial had ever gotten to Phase Three and an approval by any manufacturer involving PD-L1 which talked about strong expression of this, somehow there was this understanding that was known everywhere which we, by not telling people we weren't using committed

securities fraud.

Is there a trial they point to during the class period which established all this?  Only Merck's own trial in June of 2016, just before in August we announced our failure.  And they concede that Merck never made a public statement revealing how it was defining "strongly" with leave until February of 2016. Again, that's while the trial is underway.  There is not yet a success.

Your Honor, the nature of these trials is such that I'm not convinced that even after a single trial we have established anything more than that trial defined as "strong" showed results.  But certainly when they concede the only trial that was going on on that topic was that it's just being commenced when they're saying we're contradicting this contemporaneous understanding, there is no "there" there.  And I think that's a really important point.  There is a reference to a single trial that used the word "strong", not as a measuring point, simply as a comment on observations that were made.  I can go through if the Court wants the reference for that and it cites a press release.  I looked at the press release.  It's not attached to the complaint.  But it's quoted in the complaint.  It refers to a Merck trial called the 001 Trial, that is cited in the complaint at -- one second.  It is cited in the complaint, I believe it's 55 202 63 -- I'm sorry. In the first complaint it was -- in this one it's 63 and 245, I

K6PAATUNC-CORRECTED        Conference

believe.  When one looks at that press release which one can find just by pulling the quote.  It's on the Merck website.  It goes, over and over again.  It says, these are exploratory analyses.  Early findings for exploring a relationship of an investigational anti-PDL1 immunotherapy in preliminary findings.  They're doing a preliminary analysis.  The preliminary analysis suggests that the optimal cutoff point is 50 percent.  This is not somebody that's done a full trial with thousands of patients and the results prove that and so on.

Indeed, I believe this was studying use of checkpoint inhibitors to treat patients who had chemotherapy, the trials that are really at issue in this case, the 024 Merck trial, the 026 Bristol Myers trial involved using these competing treatments for non small cell lung cancer as a first-line treatment, meaning before or instead of chemotherapy.  So, there's much made here and little there.  But let me focus on what's changed.

I believe there to be five buckets, if you will, in which they have made some change and I want to just -- I'll rely on Judge Oetken's decision.  I'm happy to talk about part of it the Court wants but with regard to arguments where nothing has changed, but with regard to five subjects I believe they have tried to address the deficiencies in the complaint at some level but have utterly failed to.

And if I might summarize, they failed to because they

K6PAATUNC-CORRECTED        Conference

don't acknowledge these were qualitative, these were statements that the Court made about what needed to be said or to rise to the level of strong inference.  It's not about checking boxes. So, let's begin with what is the first allegation for first theory plaintiffs make in many securities cases.  The defendants had motive and opportunity from which you can refer the requisite fraudulent intent and it's based entirely on the same stock sales that were at issue -- excuse me -- when we were before Judge Oetken, not a single different trade.

The only change is that they have made a math calculation and calculated the amount of net proceeds.  The cases are very clear, your Honor, that when one looks at whether stock sales are sufficient for a strong inference of scienter, one looks for pretty extreme conduct.  One looks for batches of sales unusual in timing in the sense they are very, very close to the disclosure that the plaintiffs used to secured disclosure, that are out of character for that defendant.  It is particularly difficult to find stock sales meeting that standard when you have a class period as long as this one which is 22 months.  Of course many executives are going to have stock sales over the course of 22 months.  They get options if they want to --

THE COURT:  What about the sales in May?

MR. RIEMER:  Your Honor, let me look at that.  The sales in May which, of course, occur at a time when there is a

no allegation that anybody has any knowledge about what the results are going to be. And if I've got the right page, I thought Andreotti trades around then, we believe they made pursuant to a 10b5-1 plan, I think --

THE COURT: I think they were not. I think at least the allegation is that the May trades were not pursuant to the plan and that they may, and that by May there was an awareness at Bristol Myers Squibb and concessions that different terminology was used differently than what the public might have been led to understand by the initial disclosures.

MR. RIEMER: Let's focus in particular though on what had been disclosed because the plaintiffs concede in their complaint at paragraph 112 that in April, Bristol Myers told everybody, we did not use the same tests for strong as Merck did. Merck had only explicitly stated what it had used in February. If it's so obviously to the whole world what they'd used before then, why did they keep getting asked about it? In any event, they finally answered the question in February 2016. And in April 2016 before any of the sales that you're asking about in May, we've already told people that, number one.

Number two, if I recall the facts correctly, I think there's disagreement between us and the plaintiffs as to three of, I think, 45 sales. That's because nobody checked the boxing that they were made pursuant to a 10b5-1 plan, that they are the same number of shares on the same day of the month.

And it just doesn't wash that they would be anything but pursuant to a 10b5-1 plan.

May is also before anyone alleges that anyone at Bristol Myers knew any of the results that were going to come back as to whether or not we met our primary end point and we're not. there are cases from this district where courts have said even when sales occur two months before the ultimate disclosure, there's not enough to connect them.

I think fundamentally they are trying to lower the standard with regard to these trades.  If all we had was the May trades, I can't believe they would have even brought this case.  But for example, the Bausch & Lomb opinion, the law in the circuit is clear that stock sales are not indicative of scienter when they are more than two months before the announcement in question.  That's at 592 F. Supp. 2d 323, 345 -- I'm sorry.  That's the Western District.

THE COURT:  You don't need to give me the cite.  I have them.  Thank you.

MR. RIEMER:  OK.  Let me add with respect to the subject of trade that there were a number of problems that the Court noted.  The analysis the courts use really looks at two time periods.  One, what were the trades during the putative class period, and two, how did they compare to a pre-class period of the same length?  And they cannot, as Judge Oetken noted, they can't pass those tests and they still can't pass

K6PAATUNC-CORRECTED        Conference

those tests.  So, one test and we lay this out in Table One of Appendix B of our opening brief looks at how the sales compare during the class period to what's called the pre-class period. And Table Two of Appendix B, we look at that as well.  But I think what's particularly instructive is looking at it by virtue of the percentage of their shares they've sold.  But typically people will own more stocks and will have more sales during the class period.  If the company is doing well they're continuing to get options and so on.  So three of the four defendants if you keep looking at Table Two of Appendix B, three of the four defendants sold lower percentages of their shares during this class period than they did during the class period.  One sold virtually the same.  He went from 29.7 percent of the shares and he sold three classes.  So, that's 30.7 that was all sold (inaudible) happens to be a light increase.  Those just aren't the kind of numbers that courts find sufficient.

Let me just add, everything I've said has been about the four of the six defendants who sold anything.

THE COURT:  You have been going for quite a while and I know you have a lot more to get to because as I said to you I have carefully read all of your papers and studied Judge Oetken's opinion.  So, I would encourage you, at some point I am going to have to cut you off.  So, I want to be mindful of time and don't keep repeating what Judge Oetken held to me

because I know what he held.

MR. RIEMER:  I appreciate that and then let me try to go quicker.  I think the third and fourth buckets -- I'm sorry -- the second bucket relates to the former employees and all of the rest of these buckets for which there is any new allegations relate to the consciousness behavior recklessness prong.  Fundamentally, what we would submit there are lots and lots of cases for courts I think what former employees are seeing more significantly than this, I know requisite a strong inference here.

I want to emphasize that not one of the former employees is alleged to have supported the central allegation in the complaint that there was a industry-wide consensus that the term strong in the PD-L1 expression for purposes for this type of cancer was consistent with 50 percent of the complaint sometimes said 25 percent but not five.  None of them say that.

THE COURT:  Are you talking about the confidential witnesses now?

MR. RIEMER:  Yes, I am, your Honor.

THE COURT:  OK.

MR. RIEMER:  What they say instead are things essentially the close they get is that one of them says that certain people would have known what Merck was using and certain people would have known what BMS was using the cut off.  And that's fundamentally no different than what the plaintiffs

were alleging in the literature and so on the last time.  And Judge Oetken said that people would have known what Merck is doing.  All that establishes is knowledge that for one trial Merck was defining for its own trial strong to mean 50 and it doesn't change if you put that in the mouth of a former employee.  And we just don't have anything that I think allows you to say there's more than that.

I think it would be inappropriate and I don't think the Court said in Chipotle it would not give affect to any conclusory allegations that were based on the expert and I think it's not just legal conclusions but any conclusions. It's just not proper at this stage, particularly, because as, and you noted, Congress gave the plaintiff the burden to plead facts with particularity not to hire an expert to conclude that they're right.  The only other bucket in which I -- I'm sorry, to be very clear, when I talked about literature I could have addressed this --

THE COURT:  I have a question for you on that once you are finished.

MR. RIEMER:  I'd be glad to answer your question first, your Honor.

THE COURT:  Well, the question I have is this.  You say that their expert simply looked at all the same literature that Judge Oetken looked at.  And as I understand your argument you are basically saying he'll find differently than Judge

K6PAATUNC-CORRECTED        Conference

Oetken and concluded that Bristol Myers' statements were false and misleading.  Now, I agree with your latter point that his opinion about whether they were or weren't also misleading is entitled to zero weight.  But the question I have for you is factually didn't he look at and doesn't the plaintiff now offer more literature than what it did in the original complaint?

MR. RIEMER:  Your Honor, most of what's cited in the literature was there before.  But the new literature says the same things.  So, to me it doesn't matter.  You can't infer scienter from the fact that an article kind of like the weather report.  You know, yesterday it was 80, says there is a trial being conducted where Merck has defined strong as 50.  It doesn't matter whether they have 20 articles saying that or 40 articles saying that.  It's not enough to create a strong inference that when these trials are under way and none of this is settled that strong can only be used one way.  I think that's just not how science works and that's not how the law works.

THE COURT:  What I would like you to address though is isn't it a fact that Bristol Myers did not even internally ever treat five percent which is what its suppression level was for this trial as, quote, strong?

MR. RIEMER:  I don't know that.  I can say that there is no allegation in the complaint that Bristol Myers treated five percent as strong internally.  I can say that there are

K6PAATUNC-CORRECTED        Conference

sources cited in the complaint that show that Bristol Myers' trial contrary to what they allege was not defining positive as five but as one percent.  But from their complaint there is nothing cited where Bristol-Myers described (inaudible) up to six.  But, your Honor, that's what we were studying in 026.  Again, this was a trial test hypothesis.  The hypothesis turned out not to be proven.  It's not necessarily the case these things increase linearly and no one knew what the data was going to show.  There was no trial that had ever succeeded at getting to go an end point or failed to get to an end point, not just when this began.  But until June of 2016 when the Merck results were announced which is after we told people were not using the same cut off as them.

So, the point I was going to make related to one point in the literature that I don't think had come up before and that is a reference to a statement made in an article written about standardizing assays.  Assays, your Honor, are the methodologies that are used in a laboratory to conduct a measurement.  And they cite for I believe the first time an article and a statement that somebody, Bristol Myers, made about working with others to standardize assays.  But that had nothing to do with standardizing how one defines "strong".  That's not what an assay is.  An assay is a methodology.  If anything the fact people were speaking of standardizing that suggests there wasn't even a consensus on how one carries out

the measurements, what substances you used, the procedures you used to test the cells to measure PD-L1 positivity, let alone on what the right definition is and if that can be regarded as strong.

Let me turn to the last bucket at which there are changes and that is the subject of employee departures. We've gone from one to two. That's the only change previously, the complaint made and the allegation that the chief science officer who left in March of 2017 that one could infer scienter from that. Now, there's an allegation that one of the other people involved in a science organization, quote, left abruptly when he parted on July 25, 2016. There is no allegation that on July 25, 2016, anyone at Bristol Myers had the results and knew that we were going to be announcing in August what the results of trial were. All they have is the allegation these two people have left. People leave. What the cases say is that to infer scienter from the departure you have to plead with specificity things that connect the departure not to something negative in the business but to the alleged fraud.

In other words, if Mr. Cuss left after the trial results were out and he left because we didn't hit our primary endpoint, that's understandable. That's what happens. You need to connect it not to the fact that a trial didn't hit an endpoint but that the statements that were made about it were not accurate. And there's just nothing here that does it with

K6PAATUNC-CORRECTED        Conference

regard to Mr. Giordano any more than there was in the first complaint with regard to Mr. Cuss.

So, fundamentally I don't believe if any of what they have put on the board rises to the level of any inference of scienter. But fundamentally, to the extent your Honor disagrees with me on any part of this, I just want to highlight that ultimately one needs to engage in this comparative process where one views all of this holistically. I recognize that while I can only discuss one topic at a time, one needs to weigh everything the plaintiff says establishes scienter together, but one also needs to weigh that together against any competing inference.

With respect to the weighing it together on their side, I think the Merit Gold case which we cited where the Court said individually insufficient allegations do not combine to create an inference of scienter because zero, plus zero, plus zero, is zero.

With regard the comparison however, I think again even if the Court disagrees with me that this is a powerful case for including that the inference that there was no fraudulent intent is indeed strong. They have conceded four points that are important. One at paragraph 274 of the second amended complaint they state the following:

There is no allegation that defendants did not earnestly want checkmate 026 to succeed.

Second, at paragraph 133 they agree that we've always viewed the design of checkmate 026 and the definition of strong as confidential and proprietary information and wanted to keep it that way and told me we would keep it that way.

Third, they agreed that we made clear to investors we were not going to disclose the cut off for purposes of that trial.  That's at 136 and 198.

And fourth, they concede a number of times that this if it had been successful it would have provided us with a very, very significant competitive advantage.

I think on those facts the powerful inference to be drawn is that a company was exploring -- and I should add they concede over and over again -- this is a nascent field of evolving science and so on.  Again, they don't allege any successfully completed trial before or during the class period until June of 2016.

I think the Court might final very instructive the Cozzarelli case decided by the Fourth Circuit, a situation where a manufacturer thought it had a competitive advantage because of an indication from the FDA as to what might be required for improvement and they didn't disclose how they were going about the tests that were issued and in terms of why that point was chosen and how it had worked.

There were some sales during the class period prior to the disclosure but the insiders actually, like here, increased

K6PAATUNC-CORRECTED        Conference

their net holdings.  And the Fourth Circuit said these facts suggest an inference the defendants withheld information from the market what the intent to protect -- I'll insert the company's competitive interests instead of using the name -- it is beyond our purview to determine whether that decision was correct as a manner of business judgment, but a decision to seek a competitive advantage whether wise or not is quite different from an intent to deceive.

They have tried to distinguish that case by saying that it involved a characterization of a trial as impossible (inaudible) and instead, they've compared the situation to the Tellabs case on remand to the Second Circuit.

Your Honor, the Tellabs case, it could not be more different.  It's a case where a company was engaging in old fashioned (inaudible).  They were selling enormous numbers of their lead product which was being phased out to distributors who hadn't ordered them, booking the revenue for the sales, announcing that there was no slowdown while they are spending a fortune renting warehouse space to store everything that's being returned, a fact pattern the Court said it was still incredulous trying to understand the explanation of.  And in that context the Court said something about the fact that a gamble failed doesn't mean there wasn't scienter.  True, but nothing like this case, whatsoever.  We were testing the outer limits of what they call nascent evolving science (inaudible)

K6PAATUNC-CORRECTED        Conference

their trial succeeded.  But it is hindsight of the worst order.
They say they are not criticizing design but it's the only way
you could get there.

I submit that as Judge Forrest noted in the Keryx
opinion, in this context using the security laws to punish
people for not defining the term that science had not yet
defined on the theory that one competitor had spoken would do
real damage to the kinds of interests that drug manufacturers
ought to be trying to promote in developing drugs to help
people.

I'll stop unless the Court has any questions.

THE COURT:  The only question I have with you is if I
disagree you on the 10b-5 claim, do you have any, I assume you
concede then that the 20(a) claim also stands.

MR. RIEMER:  I think so.  Perhaps, I can consult with
my colleagues during the other party's recitation but I believe
that's correct.

THE COURT:  OK.  I just want to understand what your
position would be.

All right.  Let me hear from the plaintiff please.

MS. ORMSBEE:  God afternoon, your Honor.  Thank you
for having this hearing remotely.  Different time for us but I
want to get to the point here.

At its core this case raises two questions.  Could a
five percent PD-L1 expression level be reasonably characterized

K6PAATUNC-CORRECTED          Conference

as strong or high?  And did the defendants know that or have access to or were alerted to information suggesting that it could not?  The answer is that a reasonable investor did not understand five percent to equal strong or high and defendants knew that and at a minimum --

THE COURT:  Counsel, on what basis can I draw that conclusion?

MS. ORMSBEE:  Sure, your Honor.

Some of the new allegations that we have in the complaint and I wanted to discuss first to address Judge Oetken's concerns in his opinion are that we really detail the amount of studies by the start of a class period and throughout the class period that Bristol had already completed and published results.  And in those studies, at least five of which we detail in the complaint Bristol told the market and told investors that they considered in these studies five percent to mean mere positivity that anything less than five percent was not even considered positive and that five percent was the market for near positivity.  So, that is one indication that was available in the market and was reported on.  That's the 2012 and continuing throughout the class period multiple publications and including Bristol's presentations itself reported that five percent was a standard for positivity.

At this times and in this particular study checkmate 26, one percent was used.  But then does not equate that five

K6PAATUNC-CORRECTED        Conference

percent suddenly became strong.  Five percent was still a relatively weak percentage according to Bristol's own standard that it helped establish.  We also have our allegations that other companies such as Merck and Roche had also applied five percent in mere positivity.

You also have the market reaction which I don't think can be discounted.  It's not hindsight to say that when analysts upon hearing that Bristol had defined "strong" as five percent that they came out and said that they were completely puzzled by that and that they had been effectively misled and that had they known that it was five percent they would have suggested that the likelihood of success of this trial was 0.5 percent.

THE COURT:  How is that possible?

MS. ORMSBEE:  Because you can look at the market reaction to revelations of the fraud and see what people thought.  And these analysts are industry analysts and some of them did remark that this was complete the biggest clinical surprise of their careers when they heard that Bristol had defined strong as five percent.

So, I think that is one piece of the puzzle, your Honor.  You all have the facts that Dr. Blum who was not just looking at the literature that was cited within the complaint but was an expert in the, a contemporaneous expert who was working on these clinical studies on a data safety monitoring

board and opining on them and attending conferences, understood from all of the (inaudible) that five percent was a weak expression level.  You know, you don't have to find definitively that 50 percent was the end-all be-all definition of fraud.  But it is clear and it's common sense that five percent does not equal strong.  And defendants were saying that this was some experimental study that they were testing the outer limits, that's not the case.  This study was viewed as a conservative study, a parallel to Merck that was focused to get to market quickly and to focus on these strong expressers, those that were most likely to react positively to that treatment.  And that is just counter practical to the use of the five percent expression.  And I feel that there is multiple allegations within the complaint that showed there was an industry understanding that made five percent in no way equal to strong expression or high expression as defendants repeatedly throughout the class period represented this study to be focused on.

The reason we allege the defendants did this is Bristol wanted to mislead their chief competitor of the scope of one of their most highly watched clinical trials.  And there's copious allegations in the initial complaint and repeated in this complaint that this was a fast moving war between the two companies.  Indeed, a few months before the class period Bristol filed a patent infringement complain

K6PAATUNC-CORRECTED        Conference

against Merck. Many people in the industry were looking at these to trials to see which was going to come out because they were so similar. And to get a competitive advantage they lied to Bristol's own investors about the risks and the design of that trial and ultimately the trial failed.

THE COURT: You just said that you alleged in the original complaint and Judge Oetken already has ruled, he's rejected that argument and he has already ruled that a desire to get a competitive business advantage is not evidence of fraud.

MS. ORMSBEE: We are not saying the desire to get a competitive advantage respectfully is evidence of fraud. We are saying that was the reason they misled their investors and made the (inaudible) and that is the fact that you cannot lie to your own investors about the risk and the design of a trial.

We believe that their competitive advantage actually supports our case, that they're admitting that they did not disclose the true cut off and they called five percent strong in order to get this competitive advantage. And respectfully, I do not think that any cases the Court with clear indication here that that was a lie that that was a lie to their investors about the very material fact the expression levels were material to investors. That's why they constantly asked about them. It was one of most critical factors and elements of these studies.

K6PAATUNC-CORRECTED          Conference

So to say that --

THE COURT:  My point to you though is that you're rearguing -- Judge Oetken didn't rule on whether it was a lie or false or it wasn't false.  He ruled you haven't adequately pled scienter.  And you are now arguing the same factual allegations in support of me sustaining your complaint.  All I am warning you is I am not going to revisit any findings made by Judge Oetken or any rulings made by him.  That's the law of the case.  So, if you want to argue with respect to how you supplemented your pleadings to address the deficiencies Judge Oetken found, that's legitimate.  But it's not legitimate to go back and reargue something that you could have or you did have in your papers before Judge Oetken.

MS. ORMSBEE:  Absolutely, your Honor.  Allow me to go through those six buckets of new information and then briefly describe how those and viewed holistically with the other allegations that did exist in the complaint at the time which as they must be viewed together do support the scienter.

First, the complaint cites to numerous additional publications and documents that not only alerted defendants to an industry consensus of strong PD-L1 expression could not mean a five percent cut off but established the defendants themselves help create that industry consensus through their own publish studies and (inaudible).  We allege new allegations about Bristol's own prior Opdivo studies and how they

established five percent was a common marker and we've detailed (inaudible).

We've added allegations about several of those studies checkmates three, 12, 63, 66 and 69 where five percent was considered PD-L1 negative. Those studies, the results have been published and they were known in the market. Analysts reported on them and commented that five percent was a common marker for positivity adopted by not only Bristol but also Merck and Roche interspersed to some preexisting allegations for paragraphs 57 to 61.

We've also added new information about certain allegations (inaudible) discussed the five percent cut off as being mere positivity and noting that Bristol itself developed that. These allegations we believe combine to a finding that is facially dishonest that Bristol created industry standard that defines five expressed, five percent expression to mean weak minimal positivity and then changed the script and defined five percent as strong or high positivity for whichever purposes they have.

Second, we also have new allegations that provide additional industry articles and publications establishing the industries consensus that define and considered strong expressions to equal 50 percent expression. And this was reported in and excessive in the industry by the start of the class period. And this goes to our allegations that when

K6PAATUNC-CORRECTED        Conference

Bristol employed the use of strong or high expression in its most watched study or its most important (inaudible) that was seen as a parallel to Merck's study, there can be no doubt that the industry understood that they have a similar design and defendants knew that.

Third, the complaint includes the accounts by former employees, some of who were directly involved in the development of Opdivo and specifically checkmate 26 and they recounted how certain of the individual defendants, specifically, defendants Namouni and Giordano directly participated and improved the study design. So, they have knowledge of what exactly the cut off was which was five percent. And it was regard to the defendant (inaudible) were well aware of Merck's usage of a 50 percent cut off through both knowledge of these ongoing studies and their own competitive intelligence division.

THE COURT: Hold on, counsel. Even if I credit as true, which I must, your allegations that there are five former employees who can establish that the individual defendants involved in proving the design, so they knew what the cut off for the CM 26 trial was being five percent and they knew about Merck's study, how does that translate into an industry standard if they knew that they were different than Merck?

MS. ORMSBEE: They knew that they were different than Merck. They knew their own studies which had been reported in

K6PAATUNC-CORRECTED        Conference

the industry contributed to an understanding of what percent match at least to Bristol. And they knew that they had these two parallel studies. From the beginning of the class period they knew that they described them in exactly the same way. They knew from questions they were getting that people assumed or expected these parallels, these studies to be very parallel and they went on and still said throughout the class period, yes, we're focused on strong and high positives and the motion for class period until late April. They never and was invited to say we think the cut off is 50 percent like Merck. Do you want to correct that record? Defendants Namouni did not. He said we're focused on hypothesis. He didn't correct the record.

So these former employees established to the extent Judge Oetken asked for other specific sources of information that would indicate that these individuals had knowledge, had information of what the industry standard was and how their statements were contrary to that. To the extent the prior complaint did not contain allegations that would directly tie these defendants not just to their statements but to actually designing the study and being as the chief scientific officer deciding we are going to go with five percent. I know Merck's going to 50 percent but I'm going to call it, we're fine with calling it the same thing, knowing that that misleads the investors that are relying on our statement. That is powerful

new information contributes to the scienter analysis, your Honor.

THE COURT:  All right.

MS. ORMSBEE:  Fourth, the complaint includes the expert opinion of Dr. Ronald Blum.  As your Honor noted, you will accept at least some of Dr. Blum's commentary and conclusions --

THE COURT:  No, no, no, counsel.  I said not commentary.  I said factual allegations.  There's a very big difference.

MS. ORMSBEE:  I realize that.  Dr. Blum is an esteemed medical doctor and a clinical trial director who was involved in clinical trial --

THE COURT:  He worked at Merck, right?

MS. ORMSBEE:  He did not work at Merck, your Honor. He is an independent data safety board analyst.  He did work on some of Merck's studies but he has never been employed by Merck, your Honor.  We tried to make that clear in his declaration that was submitted with our report.  He is completely independent.  He is a medical doctor and he still practices.  But he is also on several data safety boards.  He is on the Harvard clinical study review board for 20 years and he views himself and is viewed as an independent expert in the field.  Not, he has never been employed by Merck.  He's received some monies from Merck for working as an independent

data safety analyst on their study.

And we really do think that defendants' attacks on him as far as being employed by Merck are biased in any way are truly --

THE COURT:  Hold on.  I'm not really crediting right now the assertions about his lack of independence or anything like that but my point to you or my question to you is his data point for the opinion -- and it clearly is an opinion that he offers.  He goes so far as to even offer an opinion on the ultimate legal question that these statements were false and misleading which is not appropriate under the law.  But my question is, his data point for his factual allegation is knowledge about what Merck was doing in its study, right?

MS. ORMSBEE:  I do not believe that is his sole data point.  That is a data point.  He is not seeking a 24 study. He worked on other Merck PDL one studies.  But his data point is writing about these studies being in the industry.

Judge Oetken asked for something that would show that there is an industry consensus and that these facts would have been known to the industry and therefore would have been known to the defendants.

Dr. Blum was in the industry and is in the industry and he participated in these conferences.  He's read these different journals and reports and he's worked on clinical trials contemporaneous with those that are at issue here.

K6PAATUNC-CORRECTED        Conference

Based on that significant experience and expertise and additionally based on his review of the material cited in the complaint, he did make the following factual assertions about what is industry consensus at the time based on his knowledge. He did note that it was widely understood that the (inaudible). He also opined that the industry understood five percent would be a measure of low PD-L1 expression and that in his view based on that experience and his opinions that the usage is strong or high equal to five percent was completely inconsistent with the usage of strong or high.

Similarly, Dr. Blum noted that the use of the same term by Bristol chief competitor, 50 percent expression, was misleading to the extent that Bristol used them differently without disclosing it was different.

And his final opinion as related to latter part of class period when defendants stated that even though the trial had failed that the use of five percent PD-L1 marker that they hoped that they were planning on eliciting something useful from the study and satisfying results to actually seeing what could be determined as a 50 percent level and obviously, that proves to be false as well because in October they announced a complete failure. Dr. Blum noted that by the time, that no later than the August disclosures defendants did or should have known enough trial data to know that the study was not (inaudible) to try to find results at a higher expression.

THE COURT:  Counsel, might I ask you to clarify something for me?  Let's assume I credit your argument that you have established that there was an industry standard.  It is true that you would have to establish the timing of that understanding in the industry relative to what the class period is, correct?

MS. ORMSBEE:  Correct your Honor.

THE COURT:  How am I supposed to pinpoint when this industry standard existed or came into being?

MS. ORMSBEE:  Well, we allege that industry standard existed well before the start of the class period.  I couldn't give you a specific date before January 27, 2015.  But based on Bristol studies that were reported and undergoing, the defendants well knew that they were denying at the time that and the other reports and Dr. Blum's analysis and the former employees who all were talking about their knowledge before the class period, they were working on the study in 2013 and 2014, we believe that those allegations taken together give any credible conclusion that the industry standard and consensus that five percent could not equal strong (inaudible).

THE COURT:  So, you are really arguing more that it was off and misleading to be using five percent and putting the label of "strong" on it, than you are arguing that "strong" means 50 percent.  Is that correct?

MS. ORMSBEE:  That is correct, your Honor.  You know

K6PAATUNC-CORRECTED        Conference

50 percent marks clearly how they define "strong expression". And it was reasonable for investors to believe at least for most of the class period that Bristol was doing the same.  But the real falsity here is that it wasn't 40 percent.  It was five percent.  And common sense dictate and the industry consensus of what five percent meant.  You couldn't put that label on it.  You can't call five percent strong or high.  You can't say we're looking at just what in our study, what you are undergoing right now in another study that we announced last week where we consider five percent, the merest indication of positivity that now today we consider that to be strong and high and more conservative that means we are looking at these high expressions.  It was completely misleading for them to use that.

THE COURT:  So, is it your position then that the industry standard doesn't relate to what strong means?  Instead, it relates to how one can fairly and honestly characterize five percent?

MS. ORMSBEE:  I believe that's correct.  Another way to put it is what strong does not mean, strong does not mean five percent.  We believe it was reasonable for investors to assume for most of the class period that 50 percent is a common industry use of "strong".  Yes, I believe your Honor is correct in that.  Our allegations here is how they describe their study and they describe their study as focused on strong or high and

K6PAATUNC-CORRECTED          Conference

there is no industry consensus and understanding that whatever (inaudible) strong or high to mean a number like five percent especially given Bristol's historical use of that number.

THE COURT:  How about the fact that when this all started Bristol Myers was very upfront and candid saying we're not going to disclose what are our expression level is?

MS. ORMSBEE:  That is true.  That is what they said. But they also said we are not going to disclose a number but we are going to tell you it's strong or high.  We're going to get to the market expediency because we're focused on the small stuff.  That was false.  And under established law, even where a company is not under a duty to disclose, once you choose to speak you have a duty to be both accurate and complete and they can't just say we are not going to tell you the number but we are going to tell you it's strong, when the number itself is not strong.  That is not something that is allowed under the law and there's copious cases which would be Sachs, another Bristol Myers case.  You have to render what would be not so incomplete as to mislead and they failed to do that.  They made a choice not to do that in the business pleading.

THE COURT:  All right.  I understand your position.

MS. ORMSBEE:  Thank you, your Honor.

I would like to briefly touch upon our allegations with relating to insider trading.  The defendants do lead with this and plaintiffs do not.  But we feel these allegations can

K6PAATUNC-CORRECTED          Conference

be taken on their own or taken as a holistic view as Tellabs asked the Court to do, all of these scienter tradings.  But this was $75 million in sales, $55 million in net profits which are unusual and sufficient in amount and timing.  Most of them were not done pursuant to 10b-5 plan and they were --

THE COURT:  Counsel, counsel, wait a minute.  That's not accurate to say that most of them were not pursuant to the plan, is it?

MS. ORMSBEE:  I think for all of the not for defendants, Cuss and Giordano, defendants (inaudible) Caforio and Giordano, they were not done pursuant to 10b-5 plan.  And for Defendant Andreotti especially the trade in May 2015 were not done pursuant to a 10b-5 plan.

THE COURT:  All right.  And you are talking to me about this again as supporting an inference of scienter?

MS. ORMSBEE:  Correct, your Honor.

THE COURT:  OK.

MS. ORMSBEE:  And we believe they do and it gets to become a mathematical jumble.  But if you look at the pure facts these are trades suspicious in timing.  They are close to the actual misstatements that we allege in the complaint.  And we feel under various Second Circuit laws such as the Green Mountain case (inaudible, these kinds of trades have been viewed by courts as suspicious and supportive of an inference of scienter.

The final new allegation that we have in this complaint is regarding Mr. Giordano's departure. He left ten days before the results were announced. Defense counsel is right. We can't allege at this point that they knew the results. But we think it's highly suspicious that he left at that time and we do feel that that should be viewed by the Court together with defendant's present departure as supportive of scienter.

I think you really, respectfully, your Honor, under Tellabs these new allegations are important and I think they answer the questions that Judge Oetken asked us to answer. And but when you look at them we really do ask your Honor to look at them in connection with all of the other allegations of scienter as well because they all together --

THE COURT: Counsel, your statement about Mr. Giordano leaving, your statement about the insider trading, those aren't new. They were put before Judge Oetken; were they not?

MS. ORMSBEE: Respectfully, I believe the statements about Mr. Giordano leaving are new.

THE COURT: All right. He went --

(Speaking at the same time)

MS. ORMSBEE: Your Honor, they were before Judge Oetken. He found looking at everything he did not find scienter and we certainly believe because he, just what he said, he wanted more allegations of the industry standard that

five percent was inconsistent with strong.

We do feel that we, and the Second Circuit clearly concluded that you should look -- and so did the Supreme Court -- you have to look at these holistically.  And the circumstantial evidence can be used to support scienter including where defendant's benefit in a concrete way, where they engaged deliberately in behavior where they knew facts or had access suggesting that the public statements were not accurate or failed to, it was completely misleading information or duty to monitor.

So, we do feel that it's not plausible, that it's not credible to conclude that the defendants did not know about the information telling them that Bristol at a five percent historically is the weakest level of expression and that defining it now is strong and high especially when their chief competitor did a parallel study defined it the same way as (inaudible)  And while the briefing did focus on the new allegations in the complaint, the complaint still remains and I'd like to highlight the other issue of scienter that's taken together not only paints a picture of defendants acted as useless recklessness toward (inaudible).

And to briefly highlight those, your Honor, and we do in the brief, the most important one that Judge Oetken did overlook was that the defendants admitted that the checkmate 26 was not designed to target high expression.  And they did this

during the class period and directly after the class period. And courts in this circuit and others including Judge McMahon in Avon Securities litigation repeatedly held that the district court may draw an inference favorable to the plaintiff in post class periods, events and statements.  Defendant Namouni at the end of the class period stated the study was not designed to look at the smallest subgroup of highly inflamed tumor or highest expression of PB-L1.  Basically, that's the reason we are having a study that did not meet its primary end point.

Plaintiff Caforio on August 2016, after the study's failure was first announced and during the class period said he still hoped to get data for those patients expressing PB-L1 at those very high levels, which is exactly what they had represented to people they were targeting all along.  And that month Caforio again said that they hoped to yield results of the trial's efficacy at higher levels and expressions.  And on the last day of the class period when they announced the failure of the study at the (inaudible) presentation, a representative of Bristol admitted that we didn't satisfy a high level of PB-L1.  The defendants eventually changed the clinical trials entry to correct their false statement and replaced the word "strongly" with five percent.

So, respectfully, we think that those allegations should be looked at together with all of the other new allegations we've added to this complaint and support an

K6PAATUNC-CORRECTED        Conference

inference of scienter.

We also have argued that the defendants repeatedly spoke to investors about the study and about PD-L1 expression and held themselves out as knowledgeable.  It is alleged that the study was a case study of the company's most important drug and was expected to provide one third of the company's revenues.  I'll note that Keytruda is the single largest selling drug in the entire word right now.

THE COURT:  What does that have to do with the issue before the Court, that it's a profitable product or drug?

MS. ORMSBEE:  Because when, courts have found investing Avon securities and the AMC Court that when you are talking about something that's the biggest part of the company's growth strategy so that the core operations inference, so you have to speak honestly about something so important and that you know when you are not seeking odyssey about something so important, an inference of scienter can be made.

THE COURT:  I understand your point now, OK.

MS. ORMSBEE:  Thank you, your Honor.

And also the fact that defendants actually cite in their defense the defendants were unwilling to tell people what strong meant, i.e. five percent, their unwillingness to be forthcoming about the expression level even under direct questioning is indicative of scienter.  And we cited the Flamel

K6PAATUNC-CORRECTED        Conference

Technology case there for that.  All of those allegations combined we feel on this complaint, really paints a picture that these defendants when they talk throughout the class period of this strong expression were lying.  And defendant's compelling inference that they were lying for competitive advantage is not helpful to them, we don't believe, because they're admitting that they were lying.  They admit that they made the choice not to say what strong meant when they new it meant five percent.  And I don't think Cozzarelli which is very factually different from this case, although they're a much smaller company and theory that the Court found simply implausible is helpful here, aside from being out of this circuit because the facts here when you look at them, Bristol made a gamble.  They wanted to outsmart Merck and get a bigger label and seize more control of this hot race between the two companies.  But until June they lied to their investors and people relied on those lies and people were injured by those lies.  And analysts are the voice of the people in some ways.  And when they found out that this strong expression level was five percent they directly took that as why the study failed and we believe that is why the study failed.  Those were our allegation.  We believe defendants' gamble did not payoff.  You are not entitled to gamble with the investors' fate and the accuracy of their statements.

Your Honor, I'm happy to discuss any other elements of

K6PAATUNC-CORRECTED        Conference

the case, but I wanted give you the option to see if you wanted me to discuss any of the other elements of the case

THE COURT:  No, counsel.  Thank you.  I have your arguments.  I appreciate it.

MR. RIEMER:  Your Honor?

THE COURT:  Briefly, is there anything in reply?

MR. RIEMER:  Yes, your Honor.  I appreciate the Court's patience if I could just --

THE COURT:  I am going to admonish you before you begin, please, do not repeat what you told me on your main --

MR. RIEMER:  I promise.

Counsel, number one, just went on and on and talked about us making statements describing five percent as near positivity.  That's their characterization.  I don't believe the complaint ever uses that word when we talk about five percent.

Second, in the absence of a standard, it just boggles the mind how this could be misleading.  Fundamentally, counsel is suggesting that somehow or other we all know, although, this is not about daily life.  This is about a very intricate scientific appeal that, five percent could never be strong in anything.  I don't mean to bring up the problems that are so obviously confronting all of us but we have a novel virus threatening the world about which little is known.  If I hear somebody describe five percent as the death rate, I don't think

K6PAATUNC-CORRECTED          Conference

I am going to call that low.  This is all about context and what is known at the time and so on.

And what I was surprised to hear that comment.  I think I was also criticized for suggesting that at the time there was nothing told to people to suggest there were any risks.  And part of the record is Exhibit 22, one of our SEC filings the same language appeared in many which called out in particular the risk of volatility in our stock price as a result of this particular product and the trials on it -- the Court can find on page 22 in the original numbering, 17 of 19 of the SEC numbering -- if we specifically disclose the announcement of any negative or unexpected data discontinuance of develop of any of our key oncology compounds whether alone or as part of a combination therapy, a lay or anticipated timeline or significant advancement of a competitor will likely cause our stock price to decline significantly.

This follows identifying Opdivo in particular.  The argument that's made that no one in the world here understood that strong could mean five percent would surprise, number one, the people at Nektar who in 2015 presented that slide that they said showed the industry accepted that Merck definition in which showed right next to it what we were using even though we had announced it.  It would also surprise analysts at Alliance Bernstein, at Goldman Sachs, we approached attached, I think four reports from those analysts to our papers and variously

talked about five percent, sometimes ten percent.  A number of points were made that were not new (inaudible) was raised before and it only arises if something you've said it becomes misleading.  Again, how does the fact it compels?  Nobody has gotten a finished trial prior to June.  How did the fact that your competitor reveals in February how its defining a term, meaning that what you said was misleading?  We are allowed to define terms differently than that they when these involve what they call nascent evolving science.

Your Honor, the point about holding ourselves out as knowledgeable, the single largest product, all that was addressed and rejected by Judge Oetken.  He specifically said it did not meet the core product doctrine which counsel cited has any utility anymore after the PSLRA because we don't infer facts for scienter.  Plaintiffs have to plead facts for scienter.

Unless the Court as anything further, I think I can conclude now.

THE COURT:  Right.  I appreciate it.  I will say to both sides I very much appreciate the arguments and the briefing.  It had been my hope that I might rule at the conclusion of the argument but I am going to take this under submission and I will get you an opinion as promptly as I can.

I thank you all very much for the effort in briefing and in the argument.

I would appreciate, counsel, if you would talk to one another and arrange for a transcript to be prepared and then to file it on ECF when it is ready to be but also to supply it to chambers at the chambers e-mail as soon as you have a copy of the transcript.

MR. RIEMER:  Will do, your Honor.

THE COURT:  Thank you very much.

MS. ORMSBEE:  Your Honor?

THE COURT:  Yes.

MS. ORMSBEE:  Thank you so much.

We will confer.  And if I could just say one more point?  If we were back before Judge Oetken we would ask him to consider both those new facts along with the previously allege prior facts.  So, defendant's counsel saying those old facts are foreclosed for consideration, we ask that under Tellabs and we ask the Court to consider them along with everything else and we would ask Judge Oetken the same.

THE COURT:  I don't follow that.  When you say those "old facts", I'm not --

MS. ORMSBEE:  Previously alleged facts, your Honor. Defense counsel has said that we were limited to the new facts that we allege.  And we feel that they should be used in totality with all of the allegations of scienter and (inaudible) that were in our prior complaint.

THE COURT:  No.  I'm looking at the current complaint

K6PAATUNC-CORRECTED      Conference

which is the second amended consolidated complaint.  That's what's before me, right?

MS. ORMSBEE:  Correct, your Honor.  And to the extent that we did not believe our prior allegations --

THE COURT:  Right.

MS. ORMSBEE:  -- those should be considered as well. We just --

MR. RIEMER:  I don't think that question is asked.

THE COURT:  I didn't understand differently.  I am going to look at the second amended consolidated complaint and the motion to dismiss it but I am telling you that Judge Oetken's ruling is the law of the case.

MS. ORMSBEE:  Understood, your Honor.  Thank you so much.

THE COURT:  OK.  Thank you very much.

Everybody, I hope you have a good afternoon and stay safe.

(Adjourned)